**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **WILLIAM S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:24-cv-2303-MAB[1]** |
| | ) | |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

Plaintiff William S. applied for Disability Insurance Benefits in October 2021, alleging he was disabled due to back and neck injuries and a torn left rotator cuff (*see* Tr. 89; *see also* Tr. 195). He initially alleged a disability onset date of June 15, 2017, which was the date he last worked as truck driver (Tr. 89, 233, 237), but later amended his onset date to February 4, 2023, which was his 50th birthday (Tr. 213; *see also* Tr. 40). Plaintiff's application for benefits was ultimately denied in a written decision issued by Administrative Law Judge Stuart Janney on January 29, 2024 (Tr. 14–34). ALJ Janney determined that Plaintiff had severe impairments, namely degenerative disc disease, osteoarthritis, left shoulder rotator cuff tear, sensorineural hearing loss, tinnitus, and obesity, but that Plaintiff nevertheless retained the residual functional capacity ("RFC") to perform a reduced range of light work and, therefore, was not disabled. There is no

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*see* Doc. 9).

dispute that the ALJ's decision is the final decision of the Commissioner of Social Security (*see* Docs. 14, 17).

Plaintiff is now before the Court, represented by counsel, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Plaintiff is challenging the manner in which the ALJ evaluated the medical opinion evidence and formulated his RFC (Doc. 14). More specifically, the ALJ rejected the opinions of Plaintiff's treating spine surgeon, Dr. Jacob Buchowski, and the Functional Capacity Evaluator, Andy Vitale, in favor of the opinions of the non-examining state agency physicians and adopted their limitations in forming Plaintiff's RFC (*see* Doc. 14). For the reasons explained below, the ALJ's decision is reversed.

## STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 587 U.S. 87, 98 (2019). Under the Social Security Act, a person is disabled if they have an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also* 20 C.F.R. § 404.1505.

When an applicant seeks judicial review of an adverse benefits decision, the court's role is limited to determining whether the ALJ applied the correct legal standard in reaching their decision, whether the ALJ's decision is supported by substantial evidence, and whether the ALJ "buil[t] an accurate and logical bridge from the evidence to [their]

conclusion" that the claimant is not disabled. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). Substantial evidence means "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 102, 103 (citation omitted). And the ALJ builds the requisite bridge when they "explain [their] decision in such a way that allows us to determine whether [they] reached [their] decision in a rational manner, logically based on [their] specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). The court reviews the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021).

## THE ALJ'S DECSION

ALJ Janney followed the familiar five-step sequential analysis to reach the conclusion that Plaintiff was not disabled and could perform a reduced range of light work (Tr. 17–30). *See* 20 C.F.R. § 404.1567(b) (defining light work); *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (describing the five steps).

At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity during the period from his amended alleged onset date of February 4, 2023, through his date last insured of June 30, 2023 (Tr. 19). At step two, the ALJ found that Plaintiff's severe impairments included degenerative disc disease, osteoarthritis, left shoulder rotator cuff tear, sensorineural hearing loss, tinnitus, and obesity (Tr. 20). At step three, the ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments of 20 C.F.R.

Part 404 (Tr. 20–22).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC") using treatment notes, diagnostic test results, medical opinions, and Plaintiff's own statements regarding his activities and symptoms. The ALJ found that, despite Plaintiff's impairments, he retained the ability to perform light, unskilled work with some additional limitations on lifting and other non-exertional, postural, and environmental limitations (Tr. 22).[2] Specifically, the ALJ determined that Plaintiff could:

- lift and/or carry (including upward pulling) 20 pounds occasionally and 10 pounds frequently;
- push/pull 20 pounds occasionally and 10 pounds frequently with the upper and lower extremities;
- stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday;
- sit (with normal breaks) for a total of six hours in an eight-hour workday;
- frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds;
- frequently stoop, kneel, crouch, and crawl;
- frequently reach overhead with the left upper extremity; and
- tolerate a moderate noise intensity level.

(Tr. 22).

---

[2] "Light work" is a term of art the Social Security Administration uses to categorize jobs that require lifting or carrying ten pounds frequently and up to twenty pounds occasionally. *Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014) (citing 20 C.F.R. §404.1567(b)). It requires "a good deal of standing or walking," meaning off and on for six hours during an eight-hour workday with intermittent sitting, or "sitting most of the time with some pushing and pulling of arm or leg controls." *Murphy*, 759 F.3d at 818 (citing 20 C.F.R. §404.1567(b)). *See also* Social Security Ruling 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983) (defining sedentary, light, and medium levels of exertion). If someone can do light work, then they can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

At step four, the ALJ concluded that based on his RFC, Plaintiff could no longer perform any of his past relevant work (Tr. 29). At step five, the ALJ determined, based on the testimony of the vocational expert, that given Plaintiff's age (50 years old), education (at least a high school education), work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform (Tr. 29). Those jobs included, routing clerk, marking clerk, and collator operator (Tr. 30). Accordingly, the ALJ found that Plaintiff was not disabled at any time from February 4, 2023, the amended alleged onset date, through June 30, 2023, Plaintiff's date last insured (Tr. 30).

## Issues Raised by Plaintiff

1. The ALJ failed to build a logical bridge from the evidence to his conclusion that the Functional Capacity Evaluation from Andy Vitale OTR/L, CFCE was unpersuasive (Doc. 14, p. 6).

2. The ALJ failed to build a logical bridge from the evidence to his conclusion that the medical opinion from treating spinal surgeon, Dr. Buchowski, was unpersuasive (Doc. 14, p. 9).

3. The ALJ erred in relying on the state agency physicians' opinions because they were based on Dr. Feinerman's report, which the ALJ found unpersuasive (Doc. 14, p. 11).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record, presented mostly in chronological order, contains only the facts necessary to provide context to and decide the issues raised by Plaintiff.

Plaintiff was 44 years old on June 15, 2017, the initial alleged disability onset date (Tr. 89). He was 50 years old on February 4, 2023, the amended onset date (Tr. 213; *see also*

Tr. 40). He previously worked as a semi-truck driver, which required work at the heavy exertional level (Tr. 29; *see also* Tr. 59–60, 238, 239).

Plaintiff has, as one physician said, a "[v]ery significant prior history of neck and low back problems" (Tr. 330). He had a two-level fusion on his lower back in 2010 and decompression and a two-level fusion on his neck in 2013 (Tr. 346; *see also* Tr. 330, 335). Both surgeries were performed by Dr. Jacob Buchowski (Tr. 330, 335, 346).[3] After these surgeries, Plaintiff was eventually able to go back to work as a truck driver (*e.g.*, Tr. 330). In the years that followed, however, Plaintiff had multiple on-the-job injuries to his neck, shoulder, low back, and/or knee (*see* Tr. 335). The incident that precipitated Plaintiff eventually filing for disability occurred in December 2016, when he was unhooking a trailer (*e.g.,* Tr. 330, 378, 483, 507, 510). He was pulling on the handle to release the fifth wheel, when the handle broke, causing him to lose his balance and fall on his left side, injuring his shoulder, neck, and back (*e.g.,* Tr. 378, 483, 507, 510). Plaintiff was unable to drive a truck after the accident, but he continued working for about six months with restrictions (Tr. 330). When Plaintiff's light duty time was exhausted in June 2017, he stopped working entirely (Tr. 330).

Records show that within about a week of the accident, Plaintiff started physical

---

[3] According to Dr. Buchowsky's online biography, he is an orthopedic spine surgeon who specializes in the surgical treatment of degenerative conditions of the cervical and lumbar spine. WASHU MEDICINE ORTHOPEDICS, *Jacob Buchowski, MD, MS,* https://www.ortho.wustl.edu/content/Patient-Care/2773/Find-a-Physician/Physician-Directory/Jacob-Buchowski-MD-MS/Bio.aspx (last visited Sept. 28, 2026). Dr. Buchowski is also a Distinguished Professor of Orthopedic Surgery, a Professor of Neurological Surgery, Vice Chair of Clinical Affairs at Washington University School of Medicine in St. Louis, Missouri, and director of the Washington University Spine Fellowship. *Id.*

therapy and began taking anti-inflammatory, muscle relaxant, and narcotic pain medications (Tr. 507–11; *see also* Tr. 346). After three weeks, his symptoms had not improved at all, so he was referred to Dr. Buchowski (Tr. 500–02), whom he saw in February 2017 (Tr. 346). Plaintiff rated his pain as a 7/10 in severity (Tr. 346; *see also* Tr. 499, 508). He complained of pain in his neck and his left upper arm, weakness in his left shoulder, numbness in his ring and pinky fingers on both hands, and frequent headaches in the back of his head (Tr. 346). He also complained of pain in his lower back and legs, as well as weakness and numbness in his thighs (Tr. 346). On examination, Plaintiff had mildly decreased range of motion in both his cervical and lumbar spine (Tr. 347). Dr. Buchowski ordered x-rays and an MRI of Plaintiff's cervical and lumbar spine, as well as an EMG/Nerve conduction study of his upper and lower extremities (Tr. 347). He recommended that Plaintiff continue to work in a light duty position (Tr. 347).

The EMG/Nerve conduction studies were completed in March 2017, and they showed no abnormalities (Tr. 344; *see also* 360, 364–65). The MRIs of Plaintiff's cervical and lumbar spines were also completed that same month (Tr. 369–73). Dr. Buchowski noted there were "mild degenerative changes" at the three levels above Plaintiff's cervical fusion, causing mild left neuroforaminal stenosis at C3-C4 (Tr. 344). As for the lumbar spine MRI, Dr. Buchowski noted at L3-L4—the level above the fusion—there were "mild degenerative changes" causing mild bilateral neuroforaminal stenosis and mild spinal canal stenosis (*Id.*). Dr. Buchowski believed degenerative changes at C3-C4, and possibly C2-C3 and C4-C5, were causing Plaintiff's neck symptoms while the degenerative disease at L3-L4 were causing his low back symptoms (*Id.*). He recommended that Plaintiff treat

his symptoms non-operatively through physical therapy followed by epidural steroid injections symptoms did not improve (Tr. 344–45).

After six sessions of physical therapy, Plaintiff had no improvement in his pain levels (Tr. 492), but according to Plaintiff, the worker's compensation carrier would not approve any further treatment for his back or neck because they wanted his shoulder fixed first (Tr. 331, 489; *see also* Tr. 333). Plaintiff spent the last quarter of 2017, 2018, and a majority of 2019 receiving treatment for shoulder pain, as well as right knee pain (*see* Tr. 332, 378–82, 391–97). He reported that he was released to work in mid-October 2019 without any restrictions (Tr. 333, 483, 489) and put on the dock as a forklift operator (Tr. 331, 483, 489; *see also* Tr. 59–60). He said he lasted only about two weeks before he went to the emergency room in severe pain and was written off work until cleared by his orthopedist (Tr. 333, 483, 489).

Plaintiff was referred back to Dr. Buchowski, whom he saw in December 2019 (Tr. 384–88). Dr. Buchowski ordered physical therapy, repeat MRIs of the cervical and lumbar spines, and a repeat EMG/nerve conduction study of the upper extremities. Dr. Buchowski said that Plaintiff "may NOT return to work" and was to avoid vibratory machine, extensive lifting/bending/twisting, and kneeling/squatting (Tr. 386). Plaintiff went back to physical therapy (Tr. 462–88), but reported no improvement in his pain (Tr. 463, 455). Worker's comp would not authorize the MRIs (Tr. 330). He was referred for an independent medical examination ("IME") with Dr. Robert Bernardi, a spinal neurosurgeon, in connection with his ongoing worker's compensation claim (*see* Tr. 463, 466–67; *see also* Tr. 330).

Dr. Bernardi reviewed Plaintiff's pertinent medical records from November 2007 through December 2019, imaging studies from that same time period, and the forms and questionnaires Plaintiff filled out (*see* Tr. 330–37). He met with Plaintiff in March 2020 (Tr. 330). Plaintiff reported neck pain extending from the base of his skull to his interscapular (between the two shoulder blades) region that interfered with his sleep (Tr. 331). Flexion and extension both produced a pinching sensation and sitting aggravated his discomfort, which Dr. Bernardi thought was "predictabl[e]" (*Id.*). His lower back pain radiated to his groin and sitting caused numbness along the front of both thighs (*Id.*). He said standing bothered him more than walking and sitting bothered him more than standing (*Id.*).

The physical examination was largely unremarkable (*see* Tr. 334). The only abnormality noted was that the straight leg test on the left leg produced a pulling sensation in the back of his thigh (Tr. 334). Dr. Bernardi noted that he did not detect any overt signs of symptom magnification and found Plaintiff credible (Tr. 336, 337). Dr. Bernardi's diagnosis included, in pertinent part, mild multilevel degenerative disc disease in the cervical spine and mild degenerative disc disease/facet disease at L3-L4 with mild stenosis at that same level (Tr. 335). Dr. Bernardi thought Plaintiff needed additional diagnostic testing, specifically dynamic x-rays, before he could say whether Plaintiff had reached maximum medical improvement (Tr. 336). In the meantime, Dr. Bernardi said Plaintiff required the following activity restrictions:

- No occupational driving;
- Change positions every 45 minutes to an hour;
- Avoid unsupported lumbar flexion (bending forward);
- Avoid overhead activities; and

- No lifting more than 20 pounds

(Tr. 336).

In September 2020, Plaintiff finally got new MRIs of his cervical and lumbar spine (Tr. 421–22). Dr. Buchowski noted the cervical spine MRI showed additional degenerative changes at C2-C3, C3-C4, and C4-C5 and retrolisthesis of C4 on C5 (Tr. 399; *see also* Tr. 344 (March 2017 MRI results)). There was now mild bilateral foraminal stenosis at C3-C4 and moderate bilateral foraminal stenosis at C4-C5 (Tr. 399). The lumbar MRI showed new degenerative changes at L1-L2 and L2-L3 (Tr. 399; *see also* Tr. 344 (March. 2017 MRI results)). L3-L4 now showed mild retrolisthesis of L3 on L4 in addition to the degenerative changes previously seen, continued mild bilateral foraminal stenosis, and spinal stenosis that had "worsened slightly" from mild to moderate (Tr. 399). An EMG/Nerve conduction study done in November 2020 was positive for chronic C8 radiculopathy (Tr. 399, 415).

On February 1, 2021, Plaintiff received bilateral nerve root block injections at L3 and C8 (Tr. 422–24; *see also* Tr. 398). He told Dr. Buchowski about three weeks later that the injections had not completely alleviated his pain, but it was improved to the point that he would like to avoid surgery (Tr. 398–400). Dr. Buchowski opined that, based on the diagnostic testing and the relief Plaintiff got from the C8 nerve root blocks, Plaintiff's cervical symptoms were likely due to degenerative changes at C7-T1 (*Id.*). And based on the relief Plaintiff got from the L3 nerve root block, his low back pain and lower extremity radicular symptoms were likely due to degenerative changes at L3-L4 (*Id.*). Following the injections, Plaintiff's symptoms were no longer severe enough to warrant surgical

treatment, so Dr. Buchowski referred Plaintiff to Dr. Adam LaBore for continued non-operative treatment as needed (*Id.*).[4] Dr. Buchowski planned to see Plaintiff if his symptoms worsened/on an as-needed basis (*Id.*).

As for Plaintiff's work restrictions, Dr. Buchowski opined that Plaintiff should:

- Avoid overhead activities (no overhead lifting, pushing/pulling, reaching);
- Avoid bending and twisting of the lumbar spine;
- No lifting more than 20-25 lbs;
- Change positions every 45-60 minutes; and
- Avoid occupational driving

(Tr. 400, 401).

Dr. LaBore ordered a work conditioning program in physical therapy (Tr. 403–06), but Plaintiff reported no improvement in his functional activity tolerance and no significant change in his symptoms overall (Tr. 408–11). So Dr. LaBore next ordered a functional capacity evaluation ("FCE"). The FCE was completed by Andy Vitale, a licensed occupational therapist and certified functional capacity evaluator, on August 12, 2021 (Tr. 743–55). The evaluation lasted four hours (Tr. 743). Vitale explained that Plaintiff gave an acceptable effort during the exam (Tr. 744; *see also* Tr. 745, 752, 753, 754). Plaintiff demonstrated decreased cervical and lumbar range of motion; limitations and decreased tolerance to repetitive bending, squatting, and kneeling; and limitations in lifting from

[4] Dr. Adam LaBore specializes in Physical Medicine and Rehabilitation. WASHU MEDICINE ORTHOPEDICS, *Adam LaBore, MD*, https://www.ortho.wustl.edu/content/Patient-Care/2700/Find-a-Physician/Physician-Directory/Adam-LaBore-MD/Bio.aspx (last visited Sept. 28, 2026). His practice focuses on the nonoperative care of musculoskeletal injuries and conditions, conservative care, and therapeutic, non-operative management of pain. *Id.* Dr. LaBore is also a professor of Orthopedic Surgery and Neurology and the Chief of the Neurorehabilitation Division. *Id.*

floor to shoulder, carrying, and prolonged sitting (Tr. 744; *see also* Tr. 748–49, 753, 754). Vitale also observed that during the static sitting test (which lasted 35 minutes) and the static standing test (which lasted 30 minutes), Plaintiff had to shift his weight to reduce his symptoms (Tr. 748).

Based on Plaintiff's demonstrated physical tolerances, Vitale projected Plaintiff's actual physical functional ability (Tr. 744). Specifically, Vitale opined that Plaintiff could lift 45lbs. from floor to waist, which put him in the medium duty level (Tr. 743). He could reach overhead frequently and overhead lift 25lbs. frequently (*Id.*). Plaintiff could sit frequently, meaning 34–66% of the workday (Tr. 743). Plaintiff could stand and walk only occasionally, meaning up to 33% of the workday (Tr. 743). And he could only occasionally bend, squat, kneel, and climb occasionally (Tr. 743).

Following the FCE, Dr. LaBore opined that Plaintiff had reached maximal medical improvement and recommended permanent work restrictions (Tr. 412–14). Dr. LaBore's records do not specify what those restrictions are (*see id.*). However, Plaintiff listed them on a supplemental form submitted to the SSA in April 2023 and also testified about them at the hearings before ALJ Janney (Tr. 45, 73, 306). According to Plaintiff, his permanent work restrictions are: no lifting or pulling over 20 pounds; no overhead work; no occupational driving; avoid repetitive movement with arms; limit bending, twisting, and kneeling; and change positions every 45 to 60 minutes (Tr. 45, 73, 306).

**Function Report**

Plaintiff applied for Social Security disability insurance benefits in October 2021 (*see* Tr. 89; *see also* Tr. 195), and later filled out a Function Report, dated March 1, 2022 (Tr.

256–63). Plaintiff stated that he could only walk for about half a mile, or go up three flights of stairs, before he had to rest (Tr. 261). He could not stand for more than 40 minutes before he had to sit (*Id.*). And could not sit for more than 40-45 minutes without his legs going numb or pain in his lower back (Tr. 256, 261). He could not bend over, twist at the waist, kneel, or do repetitive activities with his arms or hands without causing pain in his neck, a headache, or back pain (Tr. 256, 261).

Plaintiff stated that the pain affects his sleep; he gets up multiple times a night to walk around the house because his neck/back hurt so bad it wakes him up, or his arms and legs have gone numb (Tr. 257). Plaintiff still does normal things around the house, like laundry, folding clothes, sweeping the floors, making simple meals, dishes, and taking care of pets (Tr. 257, 258). But he needs help carrying anything heavy (like bags of pet food), and he has to take breaks during and after each task due to increased pain in his neck and back (Tr. 257, 258). Plaintiff wrote that he used to go on vacation, ride motorcycles, go to ball games, fish, garden, work on cars, and build and fabricate stuff (Tr. 257). He said he no longer does any of it because his neck/back pain "prevent him from doing almost everything that I used to do" (Tr. 260). Now he mostly stays home but does manage to visit with friends a couple times a month (Tr. 260; *see also* Tr. 70-71 (hearing testimony)).

**<u>Consultative Examination</u>**

In May 2022, Plaintiff underwent a physical examination by consultative examiner Dr. Adrian Feinerman (Tr. 733–42). When it came to reviewing Plaintiff's medical records, Dr. Feinerman reviewed only a single "progress note regarding neck and low back pain"

from an unspecified provider on an unspecified date (Tr. 733). Dr. Feinerman spent just 28 minutes with Plaintiff (Tr. 739). On exam, Plaintiff had no limitation of motion of any joint or his lumbar spine but had decreased range of motion in his cervical spine (Tr. 738, 741–42). His motor strength and reflexes were normal (Tr. 738, 739). The straight leg test was negative in both sitting and supine positions (Tr. 739). His ambulation was "normal" and he was also to ambulate 50 feet (Tr. 738). He had no difficulty with getting on/off the exam table, tandem walking, standing on his toes, standing on his heels, squatting and rising, or rising from a chair (Tr. 738). Dr. Feinerman did not indicate that Plaintiff had any restrictions whatsoever in his ability to function (*see* Tr. 733–42).

**Agency Decisions**

Approximately two weeks after Dr. Feinerman's examination, Plaintiff's application for disability benefits was denied (Tr. 89–96). The denial was based on a determination by non-examining agency physician, Reynaldo Gotanco, M.D. (who is an anesthesiologist), that Plaintiff had the residual functional capacity to perform light, unskilled work (Tr. 89–96). Specifically, Plaintiff could lift and/or carry 20 lbs. occasionally and 10lbs. frequently and was unlimited in his ability to push and/or pull with his arms and legs (Tr. 92). Plaintiff could sit, stand, and/or walk for about 6 hours in an 8-hour workday (Tr. 92). And Plaintiff could frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and could frequently stoop, kneel, crouch,

and crawl (Tr. 93).[5] Finally, Dr. Gotanco opined that Plaintiff was able to lift overhead with his left arm frequently and his right arm was unlimited (Tr. 93).

Plaintiff asked the agency to reconsider, and in August 2022, a second non-examining agency physician, Dr. Prasad Kareti (who is also an anesthesiologist) agreed with Dr. Gotanco's assessment (Tr. 97–105), and Plaintiff's claim was once again denied.

**Continued Medical Records and Hearing Testimony**

Plaintiff requested a hearing before an administrative law judge (Tr. 75–78), which did not take place until almost a year later on June 26, 2023 (Tr. 51–88). In the meantime, Plaintiff continued to receive medical treatment. In December 2022, Plaintiff told Dr. LaBore that his neck pain was flaring up (Tr. 711–13). On exam, there were no sensory or motor deficits in Plaintiff's arms but his "cervical range of motion [was] restricted with mild provocation of pain on extension, rotation/extension bilaterally" (Tr. 711). Dr. LaBore ordered an updated cervical MRI (Tr. 712), which showed, most notably, that the bilateral neuroforaminal stenosis at C4-C5 had progressed from moderate to severe and there was now moderate spinal canal stenosis (Tr. 716–17 (MRI report); *see also* Tr. 399 (Sept. 2020 MRI)). There was also now degenerative changes at C5-C7 (where the previous fusion was performed) and mild left neuroforaminal stenosis at C5-C6 (Tr. 716–17 (MRI report). While the radiologist's report says the MRI results were "not significantly changed" in comparison to the previous MRI (Tr. 717), Dr. LaBore said the

---

[5] The SSA defines stooping as "a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist" and crouching as "bending both the legs and spine in order to bend the body downward and forward." Social Security Ruling 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

results showed that the "C4/C5 disc protrusion and degenerative changes [were] combining to cause *significant* bilateral foraminal stenosis" (Tr. 763) (emphasis added). After reviewing the MRI results, Dr. LaBore ordered, and Plaintiff underwent, a C7/T1 interlaminar epidural steroid injection (Tr. 728, 756, 758, 760–61).

Later in June, Plaintiff appeared for a hearing before ALJ Janney (Tr. 51–88). He explained that he'd recently had an injection in his neck and it "kind of got rid of the muscle spasms . . . in [his] upper back" but he was still having "the real bad headaches and the numbness in [his] arms and everything" (Tr. 62). Plaintiff said that these symptoms, as well as the ringing in his ears, started right after the accident in December 2016 (Tr. 62). The headaches happen "all the time" (Tr. 62), but about two or three times a month, he gets a headache that is so bad he cannot do anything but "lay there with my head covered" and wait for it to pass (Tr. 62–63). The ringing in his ears is constant and never stops (Tr. 62). He testified that he was recently diagnosed with Meniere's disease "because [he] can't hardly even hear out of [his] right ear now" (Tr. 62; *see also* Tr. 698). Plaintiff maintained that he wakes up three to four times a night because his arms are asleep, and his legs go to sleep if he sits for too long (Tr. 66).

Plaintiff testified that he takes anti-inflammatories, Celebrex, and Tramadol every day, and Baclofen (a muscle relaxer) three times a day (Tr. 63). He also recently started taking amitriptyline at night, which has "cut way back on the real bad headaches that I get" (Tr. 63). He also said that he had lost about 100 pounds, and the weight loss helped improve the pain in his knee (Tr. 71, 72).

Plaintiff maintained that while he still does light chores around the house, he has

to take "frequent breaks" because he can feel the tension building in his upper shoulders and neck and has to go sit down for 30-45 minutes to let it subside (Tr. 64, 69, 73). As a result, chores now take him much longer than they used to. For example, sweeping the kitchen and the living room used to take him about 30 minutes but it now takes him half the day (Tr. 69). He testified that doing repetitive motions with his arms bothers his neck (Tr. 67). He can still drive but has to stop about every 45 minutes and get out and walk around to get the feeling back in his arms and legs (Tr. 70; *see also* Tr. 73). He testified that he has to be up and moving for about 30 to 45 minutes before he can sit back down (Tr. 70; *see also* tr. 73). He was asked if he could make it through an eight-hour period by alternating sitting and standing every 45 minutes, and he said no; on an average day, he would have to lay down for a couple hours to deal with his symptoms (Tr. 73–74).

After the hearing, Plaintiff saw Dr. LaBore again on July 27, 2023 (Tr. 763–64). The notes indicate that the injection Plaintiff received in June improved his periscapular (i.e., between the shoulder blades) pain and muscle spasms, but did not help with his upper cervical pain, referral pain in the shoulder/periscapular, or his headaches (Tr. 763), which is essentially the same thing Plaintiff reported at the hearing with the ALJ. On examination, "cervical range of motion provoke[d] pain" and there was tenderness in his cervical spine (*Id.*). Dr. LaBore ordered repeat bilateral C4/C5 nerve root block injections (Tr. 764), which Plaintiff received in August 2023 (*see* Tr. 768–69).

On December 4, 2023, Plaintiff appeared in front of ALJ Janney again for a supplemental hearing (Tr. 35–50). Plaintiff testified that his neck was still really bothering him (Tr. 42, 43). He continued to have vertigo, which a CT scan showed was not caused

by any issue with his ears (Tr. 41). He said he was scheduled to see a neurologist to determine if the bulging disc in his neck was causing the vertigo, headaches, ear ringing, etc. (Tr. 42–43). Aside from his neck, Plaintiff said he also had "real bad muscle spasms" in his upper back and pain down the front of his legs (Tr. 44).

Plaintiff once again testified that he could stand for only about 30 to 45 minutes before he had to sit down and "let everything calm down" (Tr. 44, 45). And he could only sit for about 30-45 minutes before his legs went to sleep (Tr. 45). He said, "I'm basically living my life 30 minutes at a time" (Tr. 44). He once again testified that if he did repetitive motions with his arms, like holding his phone up to his ear or doing the dishes, it bothered his neck and he got "real bad muscle spasms" (Tr. 45). He had to stop and rest for about 30 minutes for the spasms to subside (Tr. 46). He also testified that if he looked down for an extended period, like at his phone or while reading, he could not lift his head back up—"it's stuck." (Tr. 45–46). He would have to move his head side to side to get things moving and then try to lift it up (Tr. 46).

Three days after the supplementary hearing, Plaintiff saw Dr. LaBore and reported his neck pain, spasms, and headaches were back (Tr. 790–91). Plaintiff also had "progressively increased pain radiating from the low back into his anterior thighs limiting ambulatory activity" as well as difficulty hearing in his right ear and chronic ringing in his ears since the time of the original injury in 2016, but his consultation with an ENT was "negative" (*Id.*). On examination, Plaintiff stood and walked with mildly stooped posture (*Id.*). Lumbar range of motion provoked pain with extension (*Id.*). The straight leg raise was positive on both sides (*Id.*). And there was pain when moving his

neck (*Id.*). Dr. LaBore's diagnosis was progressively severe lumbar radicular pain and neurogenic claudication symptoms,[6] which limited Plaintiff's tolerance for walking, as well as progressive cervical radicular pain, including dizziness, headaches, and hearing changes, with a history of *severe* C4-C5 foraminal stenosis (*Id.*). Dr. LaBore ordered new cervical and lumbar MRIs and x-rays (*Id.*), but they did not demonstrate any significant changes compared to the imaging from one year prior (Tr. 792; *see also* Tr. 792–800). Dr. LaBore recommended repeating cervical and lumbar injections and also told Plaintiff to go back to Dr. Buchowski to discuss surgical options for his cervical spine issues (Tr. 792). Several days later, Plaintiff got another corticosteroid injection for his knee pain (Tr. 801).

## DISCUSSION

Plaintiff is challenging the ALJ's evaluation of the medical opinion evidence and the formulation of his RFC. A claimant's RFC is "the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008); 20 C.F.R. § 404.1545(a)(1), (3). The ALJ must determine the claimant's RFC based on "all the relevant evidence in [the] case record," which includes the objective medical evidence, as well as statements from medical sources, the claimant's own statements about their symptoms and limitations, and statements from non-medical sources, like family, friends, neighbors, and agency personnel. 20 C.F.R. § 404.1545(a)(1),

---

[6] The symptoms of neurogenic claudication are pain, tingling, or cramping in the lower back and one or both legs, hips, and buttocks, and/or weakness or heaviness in the legs. It is caused by compression of the spinal nerves in the lumbar spine. COLUMBIA UNIVERSITY NEUROSURGERY, *Nuerogenic Claudication*, https://www.neurosurgery.columbia.edu/patient-care/conditions/neurogenic-claudication (last visited Sept. 18, 2026).

(3); *see also Craft*, 539 F.3d at 676.

"[T]he ALJ must account for the totality of a claimant's limitations in determining the proper RFC," *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020), and must explain how the evidence supports the conclusions reached as to the claimant's physical capabilities. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (citation omitted); Social Security Ruling 96-8p ("SSR 96-8p"), 1996 WL 374184, at *7 (July 2, 1996). This explanation must "build a logical bridge from the medical evidence to its conclusions regarding . . . [any] limitation attendant to its residual functional capacity determinations." *Ghiselli v. Colvin*, 837 F.3d 771, 779 (7th Cir. 2016).

When it comes to evaluating statements from medical sources for disability applications filed after March 27, 2017, like Plaintiff's here, the SSA no longer "defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a).[7] Rather, the agency assesses an opinion's persuasiveness based on five factors: (1) supportability, (2) consistency, (3) the medical source's relationship with the claimant, (4) whether the medical source has an advanced specialization, and (5) other factors, such as the medical source's familiarity with other evidence in the claim. *Id.* at 404.1520c(c).

"[T]he most important" of these factors are supportability and consistency. 20

[7] A "medical opinion" is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions . . . ." 20 C.F.R. § 404.1513.

C.F.R. § 404.1520c(b)(2). The agency must explain those two factors in its analysis, and it "may, but [is] not required to, explain how [it] considered" the third through fifth factors. *Id.* "To assess supportability, an ALJ looks at the extent the relevant and objective medical evidence supports the medical opinion. The more the evidence supports the opinion, the more persuasive it is." *Cain v. Bisignano*, 148 F.4th 490, 497 (7th Cir. 2025) (citation omitted); 20 C.F.R. § 404.1520c(1). "To gauge consistency, the ALJ considers the extent to which the medical opinion is consistent with other medical evidence in the record . . . . [T]he more consistent the opinion is, the more persuasive it is." *Cain*, 148 F.4th at 497 (citation omitted); 20 C.F.R. § 404.1520c(1). In other words, the ALJ has to consider the internal supportability of medical opinion as well as whether the medical opinion is consistent with the record as a whole. *Bakke v. Kijakazi*, 62 F.4th 1061, 1068 (7th Cir. 2023).

Here, the relevant medical opinions are those of the two state agency consultants, Dr. Reynaldo Gotanco and Dr. Prasad Kareti; the February 2021 opinion from Plaintiff's treating orthopedic spine surgeon, Dr. Jacob Buchowski; and the August 2021 opinion from the Functional Capacity Evaluator, Andy Vitale (*see* Doc. 14). To recap, the state agency consultants opined in May and August 2022, respectively, that Plaintiff could (in pertinent part) sit for about 6 hours in an 8-hour workday; stand and/or walk for about 6 hours in an 8-hour workday; frequently lift overhead; and frequently stoop, kneel, crouch, and crawl (Tr. 92–93, 101–02). Andy Vitale agreed the Plaintiff could sit frequently, meaning 34–66% of the workday (Tr. 743), or up to approximately 6 hours of an 8-hour workday. Social Security Ruling 83-10 ("SSR 83-10"), 1983 WL 31251, at *5, 6 (Jan. 1, 1983) (frequently means from just over two hours up to "approximately 6 hours

of an 8-hour workday"). But Vitale opined that Plaintiff could stand and walk only occasionally, meaning to 33% of the workday (Tr. 743), or "no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5, 6 (occasionally "should generally total no more than about 2 hours of an 8-hour workday"). Vitale also said that Plaintiff could only occasionally bend, squat, kneel, and climb (Tr. 743). Dr. Buchowski opined in February 2021 that Plaintiff should change positions every 45–60 minutes, avoid overhead lifting, and avoid bending and twisting (Tr. 400, 401).

In his decision, ALJ Janney found Dr. Buchowski's and Vitale's opinions to be unpersuasive (Tr. 28). Conversely, he found the state agency consultant's opinions to be "persuasive" and adopted their limitations in forming Plaintiff's RFC (Tr. 26; *see* Tr. 22). In other words, the ALJ rejected the opinions of Plaintiff's long-time treating spinal surgeon and the physical therapist who conducted a four-hour Functional Capacity Evaluation in favor of the opinions from the two state agency physicians, who were anesthesiologists by trade, never examined Plaintiff, and viewed only a limited portion of his medical records. This strikes the Court as unusual, to say the least. But the Court will affirm the ALJ's decision so long as it is supported by substantial evidence and a logical explanation. *See Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) ("[E]ven if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying [their] claims if the decision is adequately supported.") (citation omitted).

Broadly speaking, Plaintiff argues that the ALJ failed to adequately explain his reasons for finding the medical opinions persuasive or unpersuasive (Doc. 14, pp. 6–12).

The Commissioner, in turn, argues that Plaintiff is asking the Court to reweigh the opinions in a more favorable manner, which is impermissible (Doc. 17, pp. 1, 3, 7, 11, 15). *See Bakke*, 62 F.4th 1061 ("[I]t is not our place to reweigh evidence, even where reasonable minds might disagree about the outcome."). As the Court sees it, Plaintiff is arguing that the reasons the ALJ gave for rejecting/accepting the medical opinions at issue are not rational and do not provide a logical bridge from the evidence to his conclusion. After reviewing the ALJ's decision against the record in this matter, the Court agrees—the ALJ did not provide a valid explanation for preferring the record-reviewing state agency physicians' opinions over those of Plaintiff's treating surgeon and the Functional Capacity Evaluator.

**A. DR. BUCHOWSKI'S OPINION**

ALJ Janney found Dr. Buchowski's February 2021 opinion "not persuasive" because "Dr. Buchowski does not explain why he gave the positional changes restriction" (Tr. 28). But the ALJ failed to account for the three-page contemporaneous note that immediately preceded Dr. Buchowski's opinion (*see* Tr. 28; *see also* Tr. 398–400).[8] The note reflects Plaintiff's statements as to the symptoms he was experiencing (Tr. 398), the results of the cervical and lumbar x-rays and MRIs as well as the EMG/nerve conduction studies (Tr. 399), the treatment Plaintiff had undergone (Tr. 398, 400), and medical signs involving motor strength, reflexes, range of motion, and ability to walk (Tr. 398). Notably, these are the exact same categories of information that the ALJ said the state agency

[8] In fact, as best the Court can tell, the ALJ failed to acknowledge the content of Dr. Buchowski's note at any point in his decision (*see* Tr. 18–31).

physicians used to support their opinions of Plaintiff's functional capabilities (Tr. 26; *see also* Tr. 92–94; Tr. 101–03). The ALJ thought the state agency physicians adequately supported their determination, but not Dr. Buchowski.

The Court acknowledges that Dr. Buchowski did not provide a detailed explanation linking the medical findings in his note to the work restrictions he imposed (*see* Tr. 398–401). He recounted a host of facts about Plaintiff's course of treatment and then listed the work restrictions he thought necessary, but did not actually explain how or why the facts supported the work restrictions. Crucially, neither did the state agency physicians. They did the same thing Dr. Buchowski did—provided a naked recitation of facts devoid of any actual explanation as to how those facts supported their RFC assessment (*see* Tr. 92–94; Tr. 101–03). The ALJ looked at the state agency physicians' opinions favorably but looked at Dr. Buchowski's unfavorably. The inconsistent treatment of medical opinions that are, for all intents and purposes, similarly formatted and similarly supported is illogical. *See Liapis v. Bisignano*, 180 F.4th 946, 952 (7th Cir. 2026) (holding ALJ's decision illogical where ALJ dismissed a medical opinion as unpersuasive because it was based on one-time evaluation of claimant but found opinions of four other doctors, each of whom had also only evaluated claimant once, persuasive).

Furthermore, the only thing ALJ Janney considered with respect to Dr. Buchowski's opinion was that it did not contain, according to him, a supporting explanation (*see* Tr. 28). The ALJ made no attempt to discuss whether Dr. Buchowski's opinion was supported by any relevant, objective medical evidence (supportability), or

consistent with the evidence from other medical and non-medical sources (consistency), like the regulations require (*see* Tr. 28). This omission is clear legal error that requires remand. *Liapis*, 180 F.4th at 952.

Significantly, Dr. Buchowski's opinion is also consistent with the opinion of Dr. Bernardi, the spinal neurosurgeon who conducted an independent evaluation of Plaintiff in March 2020, who also thought that Plaintiff needed to change positions every 45 to 60 minutes and should avoid overhead activities and bending (Tr. 336). It appears to the Court that Dr. Adam LaBore also agreed with the restrictions and, in fact, made them permanent (Tr. 412–14; Tr. 45, 73). In short, every specialist who evaluated Plaintiff for his neck and back pain thought he needed to switch positions at least every hour, avoid overhead activities, and avoid (or at least limit) bending. These opinions are likewise supported by Andy Vitale's observations that Plaintiff could not comfortably sit or stand for 30 minutes and demonstrated limitations and decreased tolerance to repetitive bending (Tr. 748; Tr. 744, 749).

Finally, it's difficult to square the ALJ's reason for discounting Dr. Buchowski's opinion in light of how well-known it is that prolonged sitting can lead to increased low back pain and neck pain, even in healthy individuals who do not have a significant history of low back and neck problems like Plaintiff's.[9] As Dr. Bernardi said, it was

---

[9] Gregory Billy, MD, et al, *Changes in Lumbar Disk Morphology Associated With Prolonged Sitting Assessed by Magnetic Resonance Imaging*, 6 PM&R 790 (2014), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC4152382/#S7 ("[S]edentary based jobs have increased. . . . The sedentary job typically involves the majority of the day seated . . . . Multiple studies have shown that prolonged sitting can lead to increased low back pain.");

"predictabl[e]" that sitting aggravated Plaintiff's symptoms (Tr. 331). Prolonged standing has also been shown to cause low back pain and sometimes neck pain.[10] It takes very little imagination to understand why prolonged sitting and/or prolonged standing would be problematic for Plaintiff.

In conclusion, the ALJ's reason for rejecting Dr. Buchowski's opinion was not logically sound and it is also not apparent that the ALJ meaningfully considered each of the mandatory factors set forth in the regulations—supportability and consistency—before deciding how persuasive Dr. Buchowski's opinion was.

### B. ANDY VITALE'S OPINION

The ALJ said that he "does not find [Vitale's] medical opinion persuasive" because:

> [T]he record showing the claimant's continued pain reasonably supports finding that he can perform less than the full range of light work, which is more restrictive than this opinion in many respects. Further, Mr. Vitale reported medical signs other medical sources did not. This reduces the supportability of this medical opinion. He did not offer as detailed a rationale as the State agency medical consultants did, so his medical opinion is less supportable than the prior administrative medical findings. Given the signs involving the claimant's lower extremities, he did not explain why standing and walking would be so limited. The claimant's treatment history suggests at least partial symptom relief, and thus this

---

Maryam Kamel, et al., *Alterations in Cervical Nerve Root Function during Different Sitting Positions in Adults with and without Forward Head Posture: A Cross-Sectional Study*, 12 J. Clin Med. 1780 (2023), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10003310/#B1-jcm-12-01780 ("Sustained sitting postures and the related load on the cervical spine are important contributors to the high prevalence of neck pain. Prolonged hours of sitting have shown a large incidence of pain in the head, neck, and shoulder region.")

[10] Thomas Waters, et al., *Evidence of Health Risks Associated with Prolonged Standing at Work and Intervention Effectiveness*, 40 REHAB. NURSING J. 148 (2014), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC4591921/ ("Based on review of the literature there appears to be ample evidence that prolonged standing in the work place leads to a number of negative health outcomes[,]" including pain in the low back, neck, and shoulders).

medical opinion lacks some consistency.

(Tr. 28). After reviewing the ALJ's decision against the record in this matter and the purpose of an FCE, the Court agrees with Plaintiff that the ALJ's reasons for rejecting Vitale's opinion do not make any sense (*see* Doc. 14, pp. 6–9).[11]

First, the ALJ stated that Plaintiff's "continued pain reasonably supports finding that he can perform less than the full range of light work, which is more restrictive than [Vitale's] opinion in many respects." It appears to the Court that this reasoning applies to Plaintiff's ability to lift/carry and push/pull, which are the only things the Court could identify where Vitale thought Plaintiff was capable of more than the ALJ. Plaintiff takes no issue with the ALJ's assessment as to his ability to lift/carry and push/pull (*see* Doc. 14). And while Plaintiff's continuing pain might justify greater limitations than when Vitale assessed him, it is not a reason to reject Vitale's entire opinion and the objective data he collected.

The second reason the ALJ gave for rejecting Vitale's opinion was that Vitale reported medical signs that no other medical source reported, which "reduces the supportability of his opinion." This reason pertains to consistency, not supportability. Supportability asks whether an opinion is backed by any objective medical evidence and

[11] A Functional Capacity Evaluation is a comprehensive series of tests, usually run by a physical or occupational therapist, designed to measure an individual's physical ability when it comes to things like lifting, carrying, pushing/pulling, balancing, fine motor tasks, cardiovascular tolerance, and other tasks that relate to the individual's job duties. *E.g.*, JOHNS HOPKINS MEDICINE, *Functional Capacity Evaluations*, https://www.hopkinsmedicine.org/physical-medicine-rehabilitation/specialty-areas/physical-therapy/functional-capacity-evaluations (last visited Sept. 21, 2026). The FCE is intended to provide impartial, objective data as to what work-related tasks the individual can actually perform safely at work after an injury. *Id.*

supporting explanations. 20 C.F.R. § 404.1520c(1); *Cain*, 148 F.4th at 497. Vitale's opinion is clearly supported by evidence and data; that is the whole point of an FCE. Consistency, on the other hand, looks at whether the medical opinion is consistent with other evidence in the record. 20 C.F.R. § 404.1520c(1); *Cain*, 148 F.4th at 497. The ALJ thought Vitale's opinion lacked consistency because he reported medical signs that no one else did. However, it is unclear to the Court what "medical signs" the ALJ referencing. But, regardless, Vitale spent four hours with Plaintiff, interviewing, measuring, observing, testing, etc. His assessment is comprehensive and thorough. The fact that Vitale observed signs that others did not observe should come as no surprise—a deeper investigation tends to lead to greater discoveries. It is simply not clear to the Court why this would ever be a reason to discredit Vitale's evaluation.

The third reason the ALJ gave for rejecting Vitale's opinion was that Vitale did not offer as detailed a rationale as the state agency physicians did. But just like with Dr. Buchowski, the ALJ failed to account for all of the objective and subjective information contained within Vitale's 12-page report (*see* Tr. 743–54). The report included (amongst other things) that Plaintiff had abnormalities in his gait and his posture (Tr. 747, 751), decreased cervical and lumbar range of motion (Tr. 744), and Vitale's observations that Plaintiff could not sit nor stand for 30 minutes without having to shift his weight to alleviate discomfort in his back and knee (Tr. 748). The report also included information about Plaintiff's history of surgeries on his neck, low back, left shoulder, and right knee; his complaints of pain during testing; and his reported difficulties with daily activities (*e.g.,* Tr. 744, 746). For the same reasons discussed above with respect to Dr. Buchowski,

it is simply not accurate to say that Vitale did not support his opinion as well as the state agency physicians.

The fourth reason the ALJ gave for rejecting Vitale's opinion was that "Given the signs involving the claimant's lower extremities, he did not explain why standing and walking would be so limited." Once again, it is unclear to the Court what the ALJ means here. Regardless, this line of reasoning ignores the fact that standing and walking is about more than just a person's legs. A person could have picture-perfect strength, mobility, and functionality in their legs (which Plaintiff did not, as evidenced by his knee-related diagnoses and treatment) and still be limited in their ability to stand and walk due to back and/or neck pain. *See supra* n. 10 (citing source discussing wealth of studies that show prolonged standing causes back and neck pain).

Finally, the ALJ said that Plaintiff's treatment history suggests at least partial symptom relief, which meant Vitale's opinion "lacks some consistency." Once again, the Court is unsure what the ALJ is getting at. There is certainly evidence in the record that the injections Plaintiff received provided him with partial symptom relief for a limited period of time. But the ALJ did not explain *how* or *why* that undermined Vitale's opinion, nor is not apparent to the Court.

In sum, the reasons the ALJ gave for rejecting Vitale's opinion are irrational and/or too vague to allow the Court to trace the ALJ's reasoning. None of the reasons given, when considered individually or collectively, provide adequate, logical support for finding Vitale's unpersuasive.

### C. State Agency Physicians' Opinions

The ALJ found the state agency physicians' opinions to be "persuasive" and adopted their limitations in forming Plaintiff's RFC (Tr. 26; *see* Tr. 22). Plaintiff argues that was completely illogical for the ALJ to credit the state agency physicians' opinions because they were based largely on Dr. Adrian Feinerman's report from the May 2022 consultative examination, which the ALJ found to be "very unpersuasive" (Tr. 28). *See* Doc. 14, pp. 11–12).

A review of Drs. Gotanco and Kareti's determinations shows that they, without question, relied heavily on Dr. Feinerman's consultative examination in deciding that Plaintiff was still capable of light work (*see* Tr. 90–94, 99–103). Drs. Gotanco and Kareti reviewed only a handful of Plaintiff's medical records, and Dr. Feinerman's consultative exam was one of them (*see* Tr. 90–94, 99–103).[12] Furthermore, every explanation Drs. Gotanco and Kareti gave for their RFC determinations was supported by some combination of Dr. Feinerman's findings that Plaintiff had limited range of motion in his cervical spine but full range of motion in his lumbar spine, good motion in his shoulders, negative straight leg raise, normal reflexes, normal neurological function, and a normal, unassisted gait (*see* Tr. 92, 93, 94, 101, 102, 102–03).

The problem with relying on Dr. Feinerman's report is that ALJ Janney rejected it

---

[12] Dr. Gotanco cited to the following records: (1) the March 2017 MRIs and EMG study (2) a November 28, 2018, progress note from WashU orthopedist Jay Keener (whom Plaintiff saw regarding his shoulder), (3) a December 18, 2019 progress note from Dr. Buchowski, (4) the March 10, 2020, independent medical evaluation by Dr. Bernardi, (5) the November 2020 EMG study, (6) a November 22, 2021, progress note from Plaintiff's primary care provider, and (7) Dr. Feinerman's consultative examination (Tr. 93–94).

In her decision, Dr. Kareti copied and pasted Dr. Gotanco's notes (*see* Tr. 102–03), and added some of her own notes about (1) the March 2017 MRIs (2) the November 22, 2021, progress note from Plaintiff's primary care nurse practitioner, and (3) Dr. Feinerman's consultative examination (Tr. 99–100, 103).

as "very unpersuasive" (Tr. 28; *see also* Tr. 171). The Court agrees with Plaintiff that it is illogical for the ALJ to reject Dr. Feinerman's report as very unpersuasive but then turn around and say that opinions based on Dr Feinerman's report *are* persuasive. The ALJ's decision thus does not "reflec[t] an adequate logical bridge from the evidence to the conclusio[n]." *Liapis*, 180 F.4th at 952 (citation omitted).

The Commissioner tries to avoid this result by arguing that the ALJ did not find Dr. Feinerman's opinion unpersuasive in its entirety (Doc. 17, p. 8). The Commissioner contends the ALJ was only unpersuaded by Dr. Feinerman's ultimate conclusion that Plaintiff did not have any functional limitations but "there is no indication that that the ALJ found Dr. Feinerman's *examination* findings somehow incorrect" (*Id.* (citing Tr. 28)) (emphasis in original). In other words, according to the Commissioner, Dr. Feinerman's objective medical findings were good, it was just his opinion derived from those findings—that Plaintiff had no functional limitations—was bad. The Commissioner's contention is simply not accurate. ALJ Janney made clear in correspondence prior to issuing his decision, as well as in his decision, that he did not give credence to *any* part of Dr. Feinerman's report, including his objective findings (Tr. 171; Tr. 28).[13] Specifically,

[13] Dr. Feinerman's initial report was improperly signed (Tr. 17; *see also* Tr. 171), but the ALJ obtained a properly signed report after the first hearing in June 2023, and proposed entering it as a late addition to the record (Tr. 17; *see also* Tr. 171, 313–16). In response, Plaintiff's counsel requested a supplemental hearing and for Dr. Feinerman to appear at the hearing (Tr. 17; *see also* Tr. 318). In a letter to Plaintiff's counsel, the ALJ granted the request for a supplemental hearing but denied the request to ask/compel Dr. Feinerman to appear at the hearing and basically implied there was no point in questioning Dr. Feinerman or eliciting any further information from him because the ALJ had no intention of giving Feinerman's opinion "any significant persuasive value" (Tr. 171–72). The explanation the ALJ gave in the letter more or less mirrors the explanation he gave in his written decision denying Plaintiff benefits (*compare* Tr. 171 *with* Tr. 28).

the ALJ stated that "[a]side from decreased cervical range of motion, the other musculoskeletal and neurological signs [Dr. Feinerman] reported were normal[, which] differs from many other reports of medical signs from other medical sources" and therefore Feinerman's opinion "lacks supportability" (Tr. 28; *see also* Tr. 171). That statement can only be fairly read to mean that the ALJ distrusted Dr. Feinerman's findings because they were so far afield of what other medical providers observed.

The Commissioner also argues that, as the ALJ noted, Drs. Gotanco and Kareti's opinions were supported by other medical evidence such as "cervical and lumbar medical imaging, as well as electrophysiological study results, such as the EMG," and "medical signs involving strength, reflexes, ranges of motion . . . among many others." (Doc. 17, p. 6 (citing Tr. 26)). And, as the ALJ also noted, their opinions were consistent with the evidence, did not "overlook . . . evidence favorable" to Plaintiff, and did not misstate the evidence of record (Doc. 17, p. 6 (citing Tr. 26). The Court disagrees with the notion that Drs. Gotanco and Kareti's opinions fairly reflected the evidence in the record.

Their opinions contain at least one glaring misrepresentation of the evidence. They both said that the November 2020 EMG study demonstrated "no evidence of ulnar nerve entrapment at the elbows" and showed only "normal findings in both [upper extremities]" (Tr. 91, 93, 94, 102, 103). The ALJ then repeated in his own decision that the November 2020 EMG study was "normal," which he implied undercut Plaintiff's claims of hand and arm pain and numbness (Tr. 25). But the November 2020 EMG study was *not* normal. While it showed no evidence of ulnar nerve entrapment at the elbow, it did show chronic C8 radiculopathy (Tr. 399, 415), which supports Plaintiff's claims of hand

and arm pain and numbness.[14]

The Court also thinks it is inaccurate for the ALJ to say that Drs. Gotanco and Kareti did not overlook any evidence favorable to Plaintiff. It is clear that Drs. Gotanco and Kareti's opinions were based on a *very select* portion of Plaintiff's medical records (*see* Tr. 90–94, 99–03).[15] They had access to multiple physical therapy evaluations (*see* Ex. 3F and 4F at Tr. 427–589); but mentioned none (*see* Tr. 90–94, 99–03). They had access to notes from at least a dozen visits with Plaintiff's PCP (*see* Ex. 3F and 4F at Tr. 427–589); but mentioned only one (*see* Tr. 90–94, 99–03). They had access to at least 10 notes from specialists (*see* Ex. 2F at 338–426); but mentioned only two (*see* Tr. 90–94, 99–03). They had access to MRIs taken in 2017 and 2020 (*see* Ex. 2F at 338–426); but mentioned only the former and ignored the latter (*see* Tr. 90–94, 99–03), which showed worsening degenerative changes and spinal stenosis that Dr. Buchowski felt was the likely cause of Plaintiff's symptoms. The only treatment measures they mentioned were Plaintiff's previous fusion surgeries (*see* Tr. 90–94, 99–03); there is no mention of the longitudinal

---

[14] *See Radiculopathy of the Eighth Cervical Nerve*, 40 J. OF ORTHO. & SPORTS PHYS. THERAPY 811 (2010), *available at* https://www.jospt.org/doi/10.2519/jospt.2010.3187 (explaining that patients with C8 radiculopathy typically present with pain radiating into their ring and pinky fingers, with numbness/tingling on the top and bottom of the fingers, and may also present with lower cervical pain that radiates into the medial arm and forearm).

[15] It appears to the Court that Dr. Gotanco had access to: (1) Dr. Bernardi's March 2020 independent evaluation (*see* Tr. 90; *see also* Ex. 1F at Tr. 324–37); (2) nearly 100 pages of records from Washington University physicians from December 2016 through August 2021 (*see* Tr. 90; *see also* Ex. 2F at Tr. 338–426); (3) over 150 pages of records from Plaintiff's primary care providers and physical therapists from December 2016 through November 2021 (*see* Tr. 90; *see also* Ex. 3F and 4F at Tr. 427–589); and (4) Dr. Feinerman's May 2022 consultative report (*see* Tr. 90; *see also* Ex. 9F at Tr. 733–42). Dr. Kareti had access to all of the same records as Dr. Gotanco, plus additional records from Plaintiff's primary care provider up through June 8, 2022 (*see* Tr. 99; *see also* Ex. 5F at Tr. 590–658). The list of records they actually looked at is provided above at FN12.

record of pain management visits with Plaintiff's primary care provider or the medications Plaintiff took on a daily basis to manage his pain (*see* Ex. 3F and 4F at Tr. 427–589) or the injections Plaintiff received in February 2021 (*see* Tr. 90–94, 99–03; *see also* Tr. 422–25). Nor did they mention any of Dr. LaBore's visits, evaluations, or treatments (*see* Tr. 90–94, 99–03; *see* Ex. 2F at 338–426). They did not mention the visits with the orthopedist who treated Plaintiff's knee, the diagnosis of tricompartmental osteoarthritis and meniscal tears, or the corticosteroid injections Plaintiff received for pain (*see* Tr. 90–94, 99–03; *see also* Tr. 391–96). Finally, they did not mention any of the work restrictions recommended by Dr. Bernardi, Dr. Buchowski, or Dr. LaBore (*see* Tr. 90–94, 99–03).

Additionally, there were other records that Drs. Gotanco and Kareti did not have the opportunity to review because they were not received until after the doctors had issued their decisions. These include additional records from Plaintiff's primary care provider (Ex. 6F and 12F at Tr. 659–95, 777–89) and from Dr. LaBore (Ex. 8F, 11F, and 13F at Tr. 711–732, 756–76, 790–802), another cervical MRI from December 2022 (Tr. 716–17), and Andy Vitale's Functional Capacity Evaluation (Ex. 10F at Tr. 743–55). These records show continued use of medications, as well as the prescription of new medication. They show "significant bilateral foraminal stenosis" in Plaintiff's cervical spine. They show positive findings on physical examinations and additional and various kinds of injections, which provided only partial relief and/or for a limited time. And they show that Dr. LaBore ultimately sent Plaintiff back to Dr. Buchowski to discuss the possibility of additional surgery on his neck.

In sum, all of these records that Drs. Gotanco and Kareti did *not* consider, or were

unable to consider, contain information that could undermine their previous conclusions that Plaintiff was capable of light work. *See Moreno v. Berryhill,* 882 F.3d 722, 728 (7th Cir. 2018) ("An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."). *But see Bakke v. Kijakazi*, 62 F.4th 1061, 1066–67 (7th Cir. 2023) (holding ALJ could still rely on state agency physicians' opinions despite new CT myelogram because other physicians had reviewed it, did not find it concerning, did not note a significant impact on Bakke's functional capacity, and did not order any additional or different treatment). ALJ Janney did not acknowledge the records that Drs. Gotanco and Kareti did not consider or were unable to consider, let alone articulate why he nevertheless found their opinions persuasive and why no additional limitations were necessary. The Court is simply not able to trace the ALJ's reasoning nor conclude that his reasoning was logical and backed by substantial evidence.

**D. OTHER EVIDENCE SUPPORTING THE ALJ'S DECISION**

The Commissioner argued that the ALJ considered "a wide array of evidence" and his RFC assessment "embodied his reasoned consideration of Plaintiff's symptoms" and was supported by the state agency physicians' opinions, objective evidence, treatment records, and Plaintiff's daily activities (Doc. 17, pp. 3–11). While the Commissioner intended to show that the ALJ's decision was supported by substantial evidence and sufficiently explained, a close examination of this argument actually revealed additional issues with the ALJ's decision. The Court already explained above why the ALJ's reliance on the state agency physicians' opinions was problematic. Accordingly, the Court will

discuss the other categories of information the Commissioner highlighted.

**1. Daily Activities**

The Commissioner argues that it was reasonable for the ALJ to find that Plaintiff's admitted activities suggested that Plaintiff was not as limited as alleged:

> As the ALJ indicated, Plaintiff said that he performed outdoor chores, operated an automobile, cared for pets, tended to his personal care, and prepared meals. (Tr. 24.) Relatedly, the ALJ reasonably observed that, despite his allegations of needing to lie down for hours during an eight-hour day, it was relevant that he did not actually tell his providers such information. (Tr. 26.)

(Doc. 17, p. 10).

First, while the ALJ listed Plaintiff's daily activities and concluded "this evidence supports a finding that the claimant's impairments are not as limiting as alleged" (Tr. 24), the ALJ notably omitted any mention of the qualifiers that Plaintiff provided. For example, yes, Plaintiff mows grass but he uses a riding lawnmower with "an independent suspension" and "shocks all the way around it" which prevent the vibrations from bothering his neck and low back (Tr. 68–69). Plaintiff does light chores around the house, but he repeatedly and consistently said he has to take frequent breaks and simple tasks now take him hours longer to do than before. Plaintiff drives a car, but he can only drive for about 45 minutes before he has to stop and walk around to get the feeling back in his arms and legs.

It is well-established that "[m]inimal daily activities," like the ones Plaintiff talked about, "do not establish that a person is capable of engaging in substantial physical activity." *E.g., Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000) (holding claimant's

testimony that she vacuumed, weekly grocery shopped, prepared simple meals, but had to take breaks and needed help carrying heavy things "[did] not undermine or contradict her claim of disabling pain"). *But see McHenry v. Berryhill,* 911 F.3d 866, 870, 873 (7th Cir. 2018) (finding no error where ALJ discredited claimant's descriptions regarding severity and intensity of symptoms based on her physical activities, which included yoga, biking, gardening, and extensive travel). Plaintiff's daily activities in no way lend support to the conclusion that he would be able to spend six hours a day, every day, on his feet working.

Second, the ALJ's reason for discounting Plaintiff's claim that he needed to lie down during the day to alleviate his symptoms was that Plaintiff did not routinely tell his medical providers about this limitation (Tr. 26). However, the ALJ's assessment here is fatally flawed. Providers do not necessarily write down every single thing their patients tell them, word-for-word. *See Diaz v. Colvin*, No. 2:12-CV-46-PRC, 2013 WL 5460151, at *9 (N.D. Ind. Sept. 30, 2013) (holding ALJ made an "incorrect inference" in finding claimant "not credible simply because her doctor(s) may not have written in their notes that surgery would be the next step" and noting ALJ "[did] not cite anything in support of her apparent assumption that doctors record every statement made to their patients."). And what providers do write down is often a summary and couched in medical language rather than the everyday language a patient would actually use. For example, Dr. LaBore once wrote that Plaintiff reported "upper cervical pain with shoulder/periscapular referral and posterior/occipital headaches . . . have not improved" (*see, e.g.,* Tr. 763). Those are surely not Plaintiff's words.

All of this is to say perhaps Plaintiff told his providers about his need to lie down

during the day, and they simply did not write it down. Or perhaps Plaintiff, in fact, never told his providers because they did not ask the right question to elicit that information. *See Milliken v. Astrue*, 397 F. App'x 218, 223 (7th Cir. 2010) (criticizing ALJ's rationale as "weak" where ALJ discredited claimant's claim of fatigue because fatigue was not mentioned in medical records and noting that claimant "likely had no reason" to complain about fatigue when appointment was "a consult for a second opinion about . . . leg and foot numbness and dragging"). Indeed, there are records indicating that when Plaintiff was specifically asked what relieved his pain, he reported "rest" (*e.g.,* Tr. 474–75, 492; *see also* Tr. 442–43 (told physical therapist "he did a few things around house" which made his neck pain increase "causing him to have to go lay in bed").

If the ALJ was questioning the veracity of Plaintiff's allegation that he had to lie down during the day to manage his pain, the ALJ could have and should have asked Plaintiff direct questions at the hearing to seek clarity on whether he reported this limitation to his medical providers rather than relying on attenuated assumptions and making inferences against Plaintiff. *See Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) (stating that "[t]he ALJ has a duty to fully develop the record before drawing any conclusions . . . .").

**2. Objective Medical Evidence and Treatment Records**

The Commissioner claims the ALJ's RFC determination is supported by Dr. Feinerman's findings from the May 2022 consultative examination, "an electrophysiological study that was normal and that medical signs showed no sensory deficits," and Plaintiff's reports that injections helped his pain levels, at least to some

extent (Doc. 17, pp. 9–10).

As the Court has already explained, the ALJ was skeptical of Dr. Feinerman's findings, and the EMG was *not* normal. As for the ALJ's assertion that "medical signs showed no sensory deficits," he cited to Ex. 8F (Tr. 25 (citing 8F)). That exhibit contains records from only one visit with Dr. Adam LaBore on December 13, 2022 (*see* Tr. 711–32). A finding of no sensory deficits in Plaintiff's arms on one visit hardly serves as substantial evidence, particularly when there are a myriad of records showing things like reduced range of motion, stooped posture, positive straight leg test, and there is an EMG/nerve conduction study showing chronic C8 radiculopathy and MRIs showing significant bilateral foraminal stenosis and moderate spinal stenosis. The Court also does not see how the fact that injections relieved some of Plaintiff's pain supports the ALJ's RFC determination when the medical records show that the relief was not complete or long lasting and Plaintiff's symptoms continued to worsen.

### E. Why Light Work Matters

While Plaintiff did not explain why the ALJ's errors in evaluating the medical opinions and formulating the RFC mattered (*see* Doc. 17, p. 12), the Court thinks that it is obvious when the record is fairly read. If the RFC was based on Dr. Buchowski's restrictions, meaning an individual who could:

- Lift 25 lbs. occasionally;
- Must alternate between seated and standing positions every 45 to 60 minutes (meaning he could not stand for six hours out of an eight-hour shift);
- Can occasionally reach overhead with both arms;
- Can occasionally stoop, kneel, and crouch;

- Cannot operate commercial motor vehicle equipment;
- Should never be exposed to vibration; and
- Could not work in settings with anything above a moderate noise intensity level

(Tr. 78–79), the VE testified that there would be no light or medium jobs that Plaintiff could perform. There would only be some sedentary, unskilled jobs that Plaintiff could perform.

Given Plaintiff's age at the disability onset date (50 years old, which is defined as a person closely approaching advanced), his education (which the ALJ characterized as "at least some high school"), it is possible that if he was limited to sedentary work he would be considered presumptively disabled under the Agency's Medical-Vocational Guidelines ("Grids"). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Sec. 201.00, Table 1, Rules 201.12 through 201.16. It would depend on the skill level of his previous job as a tractor trailer truck driver and whether his skills were transferrable to other jobs, *see id.*, which is an issue that the ALJ opted not to resolve (*see* Tr. 29).

Furthermore, whether the individual had an RFC based on Dr. Buchowski's restrictions or the state agency assessment, if the individual would need to occasionally lie down for symptom relief, like Plaintiff testified he would need, the VE said the individual would be precluded from any employment (Tr. 82).

In sum, the errors committed by the ALJ in evaluating the medical opinions had a material effect on the ALJ's assessments of Plaintiff's symptoms and his residual functional capacity. Without those opinions, the Court cannot say the ALJ's decision is supported by substantial evidence and a logical explanation. Therefore, the ALJ's

decision must be reversed. The Court wants to emphasize, however, that this Order should not be construed as an indication that it believes the ALJ was required to reach a certain conclusion about Plaintiff's functional limitations, or that Plaintiff is entitled to benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff William S.'s application for Social Security Disability Insurance Benefits is **REVERSED** and **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Order. The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: September 30, 2026**

Mark A. Beatty

**MARK A. BEATTY**
**United States Magistrate Judge**